UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FEDERAL GRIEVANCE COMMITTEE, : | | GRIEVANCE NO. |
| Complainant, : | | 3:20-GP-00008(JCH) |
| : | | |
| v. : | | |
| : | | |
| JONATHAN EINHORN, : | | MAY 20, 2022 |
| Respondent. : | | |

**RULING ON PRESENTMENT (DOC. NO. 21)**

I.  **INTRODUCTION**

In this grievance proceeding, the Federal Grievance Committee ("the Committee" or "the Grievance Committee") has presented Attorney Jonathan Einhorn ("Attorney Einhorn") to the court for discipline, recommending public censure for alleged violations of Connecticut Rules of Professional Conduct 1.3 (diligence), 1.4 (communication), and 1.16 (terminating representation) in his representation of Alexander Lacks ("Mr. Lacks"). For the reasons explained below, the court publicly censures Attorney Einhorn.

II.  **BACKGROUND**

This matter concerns Attorney Einhorn's representation of Mr. Lacks in federal habeas proceedings.  See Lacks v. Lojoie, 3:05-cv-01349-MRK (D. Conn.).

In 1997, Mr. Lacks was convicted of felony murder and robbery in the first degree in Connecticut Superior Court.  He was sentenced to thirty-five years' incarceration. During his trial, the prosecutor presented evidence that Mr. Lacks had been present with his co-defendant, Leotis Payne, when Mr. Payne shot the victim after threatening

1

him and taking his money. Mr. Lacks testified at trial that he had not known of Mr. Payne's intentions. State v. Lacks, 58 Conn. App. 412, 415 (2000).

Mr. Lacks appealed his convictions to the Connecticut Appellate Court, arguing that the prosecutor had made improper statements during closing argument. The court determined some of the remarks had been improper, but it declined to reverse the lower court's ruling because Mr. Lacks' counsel had not objected at trial and the prosecutor's statements were not "so pervasive or egregious" as to infringe upon Mr. Lacks' right to a fair trial. State v. Lacks, 50 Conn. Appl. 412 (2000).

Mr. Lacks petitioned for certiorari to the Connecticut Supreme Court, which denied his Petition. However, in a later appeal by Mr. Lacks' co-defendant, Mr. Payne, the Court "used its supervisory authority" to reverse the Mr. Payne's conviction on the ground of similar statements[1] the same prosecutor made during closing arguments in Payne's separate trial. State v. Payne, 260 Conn. 446, 450 (2002). Subsequently, Mr. Lacks filed a state Habeas Petition, reasserting his prosecutorial misconduct claims and adding ineffective assistance of counsel claims. The trial court rejected his claims, the Connecticut Appellate Court affirmed, and the Connecticut Supreme Court denied review. Lacks v. Warden, No. 559588, 2003 WL 21675950 (Conn. Super. Ct. July 2,

---

[1] At both Mr. Payne's and Mr. Lacks' trials, the prosecutor made statements vouching for the credibility of the state's witnesses, implying that the defendant had a motive to lie, and potentially appealing to the jury to find the defendant guilty out of sympathy for the victim's family. See, e.g., Lacks Second Am. Habeas Pet. (Doc. No. 25 at 108-112) (comparing statements from both trials). While the statements at Mr. Payne's trial were arguably more improper and prejudicial, the comments were, in many regards, similar. Mr. Payne's attorney objected to some statements at trial but failed to object to others.

After Mr. Payne's conviction was reversed by the Connecticut Supreme Court, he was granted a new trial and, after two subsequent mistrials, was re-convicted. See State v. Payne 303 Conn. 538, 568 (2012).

2

2003), aff'd sub nom. Lacks v. Comm'r of Correction, 87 Conn. App. 225 (2005), cert denied 273 Conn 922 (2005).

Mr. Lacks then timely filed a federal Habeas Petition and a Motion to Appoint Counsel. Lacks v. Lojoie, 3:05-cv-01349-MRK (D. Conn.) (Doc. Nos. 1, 2). The court granted the Motion to Appoint Counsel on September 21, 2005, appointing Attorney Einhorn to represent Mr. Lacks. Attorney Einhorn took no action in the case for nearly a year. The court held a status conference on August 28 and set a new deadline of September 20, 2006, for Attorney Einhorn to file an Amended Petition. Id. (Doc. No. 10). Attorney Einhorn failed to file an Amended Petition. On October 27, 2006, the State filed its Answer, making no substantive arguments but relying on "the state court record, the respondent's briefs to the Connecticut Appellate Court, and the decisions of that court." Id. (Doc. No. 13).

On November 9, 2006, Attorney Einhorn filed a Motion requesting an extension of time to file a Memorandum in support of Mr. Lacks' Petition. The court granted the Motion, setting a deadline of February 9, 2007. Attorney Einhorn failed to file a Memorandum by that deadline. On May 24, 2007, the court ordered him to file by June 15, 2007, warning, "FAILURE TO FILE MAY RESULT IN DISMISSAL FOR FAILURE TO PROSECUTE." Id. (Doc. No. 18).

When Attorney Einhorn again failed to file or respond in any way by the extended deadline, Judge Kravitz dismissed the case for failure to prosecute. Id. (Doc. No. 19). The court's Order of dismissal noted that Attorney Einhorn had repeatedly missed deadlines and allowed Mr. Lacks' Petition to "languish[ ] for almost a year" before the court's status conference. Id. The court nonetheless stated that it would "entertain a

motion to reopen upon a showing of good cause, so long as the motion to reopen is filed no later than July 23, 2007." Id.  Attorney Einhorn filed no such motion.  Nearly four years later, on May 24, 2011, he did file his first and only CJA voucher for work done in 2011.

Years later, on September 25, 2020, Mr. Lacks, who was still incarcerated, filed a Complaint against Attorney Einhorn alleging that he had failed to inform Mr. Lacks that his Habeas Petition had been dismissed.  See Compl. (Doc. No. 1).  Mr. Lacks alleged that he had learned of the case's dismissal from another attorney.  Id.  Attorney Einhorn responded to the Complaint, denying the allegations.  See Response (Doc. No. 3).  On April 4, 2021, the Grievance Committee held a hearing on Mr. Lacks' Grievance via Zoom.  See Notice of Hearing (Doc. No. 9).

After the hearing, on October 5, 2021, the Grievance Committee filed a Presentment for Discipline recommending that the court order public censure of Attorney Einhorn for violating "[Rule of Professional Conduct] 1.4 by failing to reasonably communicate with [Mr. Lacks] and [Rules of Professional Conduct] 1.3 and 1.16 by failing to take reasonable steps to protect the interests of [Mr. Lacks] after he determined that he would not be pursuing the pending habeas petition." See Presentment at 13-14.  This court issued an Order to Show Cause why discipline should not issue.  See Order to Show Cause at 1 (Doc. No. 22).  Attorney Einhorn responded, denying that he had violated the Rules of Professional Conduct because he had strategically decided not to file a memorandum in support of Mr. Lacks' Habeas Petition, and his communication with Mr. Lacks, while "not perfect", was reasonable.  See Einhorn Response to Order to Show Cause at 2, 5-7 (Doc. No. 25).

4

This court then held an evidentiary hearing on February 14, 2022.  See Minute Entry (Doc. No. 30).  At the hearing, Mr. Lacks testified that Attorney Einhorn last came to see him around fifteen months before the hearing, in late 2021 or early 2022.  See Feb. 14, 2022 Hearing.[2]  He elaborated that Attorney Einhorn has called him around five to six times a year since 2005.  Id.  Until 2020, however, Attorney Einhorn never informed him that his case had been dismissed.  Id.  Based on his demeanor, and the evidence and lack of evidence in the record, the court credits Mr. Lacks' testimony.[3]

In contrast, Attorney Einhorn testified that, at the outset of his representation of Mr. Lacks, he had researched his claims and relevant habeas law[4] and had come to believe that Mr. Lacks could not overcome the high barriers to obtaining relief.  Id.  Accordingly, he testified, he told Mr. Lacks that he had no viable claim at their first meeting.  Id.  He also decided not to pursue the Habeas Petition, although he did not inform Mr. Lacks of his plan.  Id.  After Judge Kravitz dismissed the case on July 9, 2007 with a deadline of July 23 to file a Motion to Reopen, Attorney Einhorn testified, he told Mr. Lacks of the dismissal on August 6, 2007.  Id.  From that point on, he claims, he continued to call and visit Mr. Lacks several times a year, though during their conversations, the two primarily lamented the injustice Mr. Lacks was facing.  Id.

---

[2] The transcript of the February 14, 2022 Hearing has not been ordered by the parties and, as such, does not appear on the docket. Where the court cites to the Hearing in this Ruling—as well as to the Oral Argument in this case held on February 17, 2022—it therefore does so generally, based on its notes and recollection of the Hearing and the Oral Argument.

[3] The Grievance Committee likewise credited Mr. Lacks.  See Presentment at 9; see also In re Hochbaum, 649 F. App'x 80, 83 (2d Cir. 2016) (accepting the credibility determination of the Second Circuit Committee on Admissions and Grievances where it was not clearly erroneous).

[4] Attorney Einhorn conceded that no voucher or record of any kind reflects his time spent researching habeas law.  Indeed, other than a CJA voucher filed in 2011 for time spent from March 29, 2011 to March 31, 2011, no other voucher was filed or record exists for Attorney Einhorn's time spent while the case was pending or after.  See CJA Voucher (Doc. No. 25-1).

5

Attorney Einhorn also testified that his decision not to file a Memorandum was strategic: he was hoping for new facts, new law, or new evidence to turn the tide in Mr. Lacks' favor.  Id.  To that end, Attorney Einhorn was considering tracking down a key witness in Mr. Lacks' case, Mr. Marrero.  Id.  He was also considering applying for a sentence modification or a commutation, although he believed the chances of a commutation were slim.  Id.  He thought it was better, he claims, to leave Mr. Lacks with what Attorney Einhorn described as a "clean slate" than to file a Memorandum on the basis of which, Attorney Einhorn believed, Judge Kravitz would rule against Mr. Lacks.  Id.

Three days after Attorney Einhorn's hearing, on February 17, 2022, the court held oral argument.  See Feb. 17, 2022 Oral Argument (Doc. No. 37).  At oral argument, Attorney Einhorn's attorney conceded that, although Attorney Einhorn purports to have affirmatively decided not to file a Memorandum in hopes that certain circumstances would change, he took few steps to determine how likely those circumstances were. For instance, while he hoped that a key witness, Mr. Marrero, would change his testimony in Mr. Lacks' favor, he never interviewed Mr. Marrero before declining to file the Amended Petition or Memorandum.  Id.  Although he claims he thought a sentence commutation or sentence modification could have worked to Mr. Lacks' advantage, Attorney Einhorn did not speak to the prosecutor—whose consent was required for sentence modification at the time, Conn. Gen. Stat. § 53a-39 (2005-7)—before deciding

not to file a Memorandum.  Further, Attorney Einhorn never applied for a pardon or commutation, nor did he pursue sentence modification at any point.[5]  Id.

Attorney Einhorn's counsel also conceded that there is no evidence in the record that Attorney Einhorn ever told Mr. Lacks he had spoken with the Judge Kravitz during the August 2006 status conference, nor that he had a September 20, 2006 deadline to file a Memorandum in support of the Habeas Petition.  Id.  Nor is there evidence that he informed Mr. Lacks that he asked for an extension nor that he would not be filing a Memorandum before the final, July 6, 2006 deadline.  Id. [6]  Finally, after Judge Kravitz dismissed the Habeas Petition, Attorney Einhorn never told Mr. Lacks the dismissal was for failure to file a Memorandum after a warning from Judge Kravitz.  Id.

Throughout the hearing, Attorney Einhorn's counsel maintained that Attorney Einhorn's decision to abstain from filing a Memorandum or Amended Petition ultimately "worked", because Mr. Lacks was released from custody on November 4, 2021, on a Motion for Reduction of Sentence owing to a 2021 change in the law.  Id.; see also Pub. Act 21-102 (Conn. 2021).  However, nothing that Attorney Einhorn did led to that release.  Mr. Lacks' sentence modification was the product of the 2021 legislation fortuitously enacted after Mr. Lacks filed the instant Grievance in 2020.[7]  Clearly,

---

[5] If Attorney Einhorn had pursued sentence modification, a successful petition would have required the consent of prosecutor District Attorney Pepper.  See Conn. Gen. Stat. § 53a-39 (2019).  It is uncontested that Mr. Pepper would not have consented, as Mr. Pepper blocked two attempts by Mr. Lacks to file for early termination of his sentence.  See Einhorn Response to Order to Show Cause at 8 (Doc. No. 25); Presentment at 11 n. 8.  Mr. Lacks was ultimately released after a 2021 change to Connecticut law allowed him to obtain sentence modification from the court without the prosecutor's consent.  Pub. Act 21-102 (Conn. 2021).

[6] Indeed, Attorney Einhorn, in a post-hearing letter to the court, stated that he did not inform Judge Kravitz or Mr. Lacks of his "plan."  See Einhorn Letter (Doc. No. 38).

[7] Attorney Einhorn's counsel also suggested that Mr. Pepper's retirement, which occurred shortly before the change in Connecticut's law, could have facilitated Mr. Lacks' sentence reduction, as Mr.

Attorney Einhorn's "plan" not to file an Amended Petition or Memorandum played no role whatsoever in bringing about the 2021 sentencing reform or permitting Mr. Lacks to benefit from it.  Indeed, when pressed by the court, Attorney Einhorn's counsel could not think of a situation more prejudicial than the dismissal that Mr. Lacks' claim received from Judge Kravitz due to Attorney Einhorn's failure to file.  Nor was Attorney Einhorn's counsel able to explain why the sentence-reduction relief that Mr. Lacks ultimately received after over twenty years in custody would not have been available even if Mr. Lacks' Petition been decided and denied on the merits by Judge Kravitz in 2007.  Id.

On March 3, 2022, Einhorn filed a letter with the court admitting the existence of a "flaw" in his "well intentioned plan" to "put[ ] the habeas on the back burner until we could come up with a factual or legal argument that had merit."  Einhorn Letter at 1 (Doc. No. 38).  In the letter, he acknowledged that, although he had believed in 2005 that the Habeas would fail on the merits and prejudice Mr. Lacks, he "should have notified both the Court and Mr. Lacks of [his] plan."  Id.  He admitted that he did not "notify[ ] the Court and Mr. Lacks that [he] would not be filing a memorandum", although he contended that he told Mr. Lacks his Petition would be dismissed.  Id.

### III.   FINDINGS AND DISCUSSION

    A.   <u>Whether Attorney Einhorn Violated the Rules of Professional Conduct</u>

The Grievance Committee found that Attorney Einhorn violated three Rules of Professional Conduct: Rule 1.3 (diligence), Rule 1.4 (communication), and Rule 1.16 (terminating representation).

---

Pepper's successor may have been more likely to consent.  See Feb. 17, 2022 Oral Argument.  In any event, whether Mr. Lacks obtained his sentence reduction due to the change in Connecticut law or due to Mr. Pepper's retirement, Mr. Einhorn's failure to file an amended petition or memorandum did not in any way give rise to the circumstances leading to Mr. Lacks' release.

1.  Habeas Law

Before turning to the specific charges, the court feels a discussion of the relevant law of habeas corpus would be helpful to the evaluation of the charged violations.

Attorney Einhorn claims that he decided not to file an Amended Petition or Memorandum because "there would have to be some different result that could occur applying federal law as opposed to Connecticut law", so there was no likelihood that Mr. Lacks would win.  See Grievance Hearing Transcript at 25 (Doc. No. 12).  Attorney Einhorn also contends that he did not supplement Mr. Lacks' Habeas Petition because the "issues had been fully explored by Connecticut [c]ourts in six cases . . . ."  See Response to Order to Show Cause at 19.  Lastly, he states he chose to "put[ ] the habeas on the back burner", see Einhorn Letter, in the hopes that "new evidence, if found, or a new law could result in a new habeas . . . ."  Response to Order to Show Cause at 6.  These arguments by Attorney Einhorn appear to this court to misunderstand the law of federal habeas.

When a defendant is convicted in a criminal case in Connecticut state trial court, he may challenge that conviction by means of a direct appeal to the Connecticut Appellate Court and, subsequently, to the Connecticut Supreme Court.  See Conn. Gen Stat. § 54-95.  If he does not obtain relief on direct appeal, he may collaterally attack his conviction by filing a petition for habeas corpus in the state court system, initiating proceedings at the trial court level and appealing an unfavorable judgment to the Appellate and Supreme Court.  See Conn. Gen. Stat. § 52-466.  If, after exhausting these state court avenues for direct and collateral review, he fails to obtain relief, he may file a petition for habeas corpus in federal district court.  See 28 U.S.C. § 2254.  If a petitioner's first habeas petition is denied, he may not file a second petition unless he

obtains leave from the Court of Appeals.  28 U.S.C. § 2244(a).  The appellate court may grant a second petition only on the exceedingly narrow grounds of newly discovered exculpatory evidence or a new, retroactive rule of constitutional law.  28 U.S.C. § 2254(b).  At each stage of the review process—on direct review,[8] in state habeas proceedings,[9] in federal habeas cases,[10] and on a second federal petition[11]—different standards of review apply.

Each of Mr. Einhorn's purported reasons for neglecting Mr. Lacks' habeas matter reflects a fundamental misunderstanding of federal habeas law and its consequences

---

[8] "[C]ollateral review of a conviction applies a different standard than the direct appeal . . . ." Figueroa v. Comm'r of Correction, 596 F. Supp. 2d 482, 488 (D. Conn. 2009).  As is true for many defendants, Mr. Lacks did not raise his ineffective assistance of counsel claims on direct review, instead challenging the underlying misconduct of the prosecutor.  The Appellate Court held that review of Mr. Lacks' claims of prosecutorial misconduct was unavailable because his trial counsel had not objected contemporaneously, and any such misconduct was not "so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial . . . ."  State v. Lacks, 58 Conn. App. 412 (2000).

[9] In a Connecticut state habeas proceeding, a petitioner who, like Mr. Lacks, "raises a constitutional claim for the first time . . . must show: (1) cause for the procedural default, i.e., for the failure to raise the claim previously; and (2) prejudice resulting from the alleged constitutional violation."  Johnson v. Commissioner of Correction, 218 Conn. 403, 409 (1991) (adopting the standard established in Wainwright v. Sykes, 433 U.S. 72, 87 (1977)); see also Lacks v. Warden, 2003 WL 21675950, *2 (applying the same standard to Mr. Lacks' ineffective assistance of counsel claim).

[10] In federal habeas proceedings, courts have historically applied one or both of two tests: one prescribed by Congress in AEDPA, and one outlined by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619 (1993); see also Brown v. Davenport, 142 S. Ct. 1510 (2022) (holding that courts federal courts should apply both tests).  Under 28 U.S.C. § 2254(d) as amended by the AEDPA, a state prisoner's application for habeas corpus will not be granted with respect to any claim that was adjudicated on the merits unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Under the Brecht test, a petitioner must show that the constitutional trial error he seeks to review had a "substantial and injurious effect or influence" on the outcome of his trial.  Brecht, 507 U.S. at 638.  In Mr. Lacks' case, the court did not reach the merits of his claim, but rather dismissed for a failure to prosecute. See Order of Dismissal, 3:05-cv-01349-MRK (D. Conn.) (Doc. No. 19).

[11] In a second or successive petition, any claim presented in a prior application must be dismissed, and a new claim must be dismissed unless the applicant identifies (A) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (B) new facts that "could not have been discovered previously" and are "sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  See 28 U.S.C. § 2244(b).

for his client. First, the fact that Mr. Lacks had previously raised the same claims in his state Habeas Petition was not a barrier to proceeding, but rather was a necessary exhaustion prerequisite to his filing a federal Habeas Petition. See 28 U.S.C. § 2254(b)(1)(A). Indeed, given AEDPA's exhaustion requirement, few state prisoners could ever bring a habeas claim in federal court if advocates were to avoid litigating habeas claims that had already been considered on state collateral review.[12]

Second, the varying standards of review at each successive stage of the post-conviction process undercut Mr. Einhorn's contention that Mr. Lacks' case would fail because "there would have to be some different result that could occur applying federal law as opposed to Connecticut law." See Grievance Hearing Transcript at 25. As the Grievance Committee rightly observes, the question was not, as Mr. Einhorn seemed to believe, whether state and federal law claims would lead to a different result, but "whether the state court's adjudication of the federal claims was an unreasonable application of clearly established federal law or based on an unreasonable factual determination." See Presentment at 8 n. 6 (citing 28 U.S.C. § 2254(d)). The disparate standards of review created an opportunity for Mr. Einhorn to raise a colorable argument on Mr. Lacks' behalf.

Lastly, Mr. Einhorn's purported desire to "pursue a tactical route toward putting the habeas on the back burner" was regretfully misinformed, as any future petitions raised on the same grounds by Mr. Lacks were likely to be curtailed by the stringent standard for second or successive habeas petitions. See 28 U.S.C. § 2244. Moreover,

---

[12] AEDPA also allows a limited path to federal habeas review in the absence of exhaustion where the state lacks an effective corrective processes. See 28 U.S.C. § 2254(b)(1)(B).

the changed circumstances for which Attorney Einhorn "h[eld] out hope"— namely, "new evidence . . . or a new law [that] could result in a new habeas . . . ."—would have provided grounds for a second or successive habeas petition under AEDPA § 2244(b) even if Attorney Einhorn <u>had</u> litigated Mr. Lacks' Petition.  Thus, Mr. Lacks gained no benefit from Attorney Einhorn's misguided and unilateral decision to abandon Mr. Lacks' Habeas Petition.

The three violations with which Attorney Einhorn has been charged stem from his failure to uphold his duties to his client and the habeas court, not a lack of competence in analyzing or applying the relevant law.  However, the conspicuous flaws in Attorney Einhorn's approach reinforce this court's determination that his violations, discussed below, were not the mere byproducts of a reasonable litigation strategy, but were serious and harmful to the court, to the administration of justice, and, more acutely, to Mr. Lacks.

    2.    Rule 1.3: Diligence

Rule 1.3 of the Rules of Professional Conduct requires an attorney to "act with reasonable diligence and promptness in representing a client." Conn. R. Prof. Conduct 1.3 (2006).[13]  Attorney Einhorn's conduct throughout his representation of Mr. Lacks demonstrated a troubling lack of diligence.  He failed to timely file a memorandum or amended petition, taking no action in the case until Judge Kravitz arranged a status conference.  He then failed to meet the deadline to file a memorandum or to file a

---

[13] The court refers to the 2006 version of the Connecticut Rules of Professional Conduct, which was in effect at the time that Attorney Einhorn represented Mr. Lacks with respect to his Habeas Petition. However, Rules 1.3, 1.4, and 1.16 have not changed in any material respect such that they impact this court's analysis of Attorney Einhorn's conduct from the time the habeas action was dismissed in 2007 through the filing of the instant case in 2020.  <u>Compare</u> Conn. Rules of Prof. Conduct §§ 1.3, 1.4, 1.16 (2006) <u>with</u> Conn. Rules of Prof. Conduct §§ 1.3, 1.4, 1.16 (2020).

12

motion to reopen after Judge Kravitz closed the case. Attorney Einhorn never advised Mr. Lacks of either of these inactions. Rather, Attorney Einhorn knowingly chose to ignore Judge Kravitz's deadline and declined to file a memorandum without informing the court or his client of his intentions. The court finds that, once Judge Kravitz closed the case, Attorney Einhorn never informed Mr. Lacks of the case's dismissal or the reasons for the dismissal.

While Attorney Einhorn insists his failure to file a memorandum was a strategic choice—<u>albeit</u>, a choice which he now admits was misguided—he demonstrated no diligence in pursuing this purported "strategy." While he claims that he hoped for a change in circumstances to benefit Mr. Lacks, he did not interview Mr. Marrero or talk to the prosecutor before declining to file a memorandum or amended petition. Nor did he interview Mr. Marrero or pursue a sentence commutation in the period before or after Mr. Lacks' case was dismissed. Attorney Einhorn asserts that he did not want to prejudice Mr. Lacks by filing an amended petition or memorandum that was likely to be denied on the merits, but he has failed to explain how a potential denial on the merits could be more prejudicial than the dismissal that Judge Kravitz issued as a result of Attorney Einhorn's inaction.

For these reasons, the court concludes that Attorney Einhorn knowingly violated Rule 1.3 by failing to show reasonable diligence in his representation of Mr. Lacks.

        3.     Rule 1.4: Communication

Under Rule 1.4, an attorney must "keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information", and "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Conn. R. Prof. Conduct 1.4 (2006).

The court finds that Attorney Einhorn did not tell Mr. Lacks of his plan not to file a memorandum.  See Feb. 14, 2022 Hearing.  Nor did Attorney Einhorn notify Mr. Lacks of his failure to file after the court granted an extension.  Further, Attorney Einhorn failed to keep Mr. Lacks reasonably informed when he did not disclose his decision to decline to file a memorandum, an act which ended Mr. Lacks' case and denied him the opportunity to have his habeas claim considered on the merits by Judge Kravitz.  Throughout his handling of Mr. Lacks' habeas action, Attorney Einhorn failed to explain his "strategy" to the extent reasonably necessary to allow Mr. Lacks to make an informed decision regarding the disposition of his case.

Moreover, after the case was closed, the court finds that Attorney Einhorn never told Mr. Lacks that the case was dismissed due to Attorney Einhorn's failure to comply with the court's Order and file a memorandum or amended petition.  Id.  Nor did Attorney Einhorn disclose the possibility of moving to reopen the case before July 23, 2007.  Id.  Further, the court finds that Attorney Einhorn never communicated to Mr. Lacks that the matter had been dismissed.  Indeed, the court finds that Mr. Lacks had been under the impression until 2020 that the case was ongoing.  Id.  While Attorney Einhorn did call Mr. Lacks several times a year after the case was dismissed, there is no evidence in the record that Attorney Einhorn explained during those calls why or how Mr. Lacks' case was dismissed.  Indeed, the record includes no written communication whatsoever between Attorney Einhorn and Mr. Lacks over the course of their 13-plus year relationship.

Because Attorney Einhorn failed to keep Mr. Lacks reasonably informed or explain the matter to the extent necessary to allow Mr. Lacks to make informed

14

decisions about his habeas action, Attorney Einhorn's lack of communication amounts to a negligent violation of Rule 1.4.

        4.      Rule 1.16: Terminating Representation

Rule 1.16 requires an attorney to withdraw from representation of a client if "the representation will result in violation of the Rules of Professional Conduct", and to "take steps . . . to protect a client's interests . . . ." Conn. R. Prof. Conduct 1.16 (2006). Further, as the commentary to Rule 1.3 explains, a lawyer should carry through all matters undertaken for a client to the end "[u]nless the relationship is terminated as provided in Rule 1.16." See Commentary, Conn. R. Prof. Conduct 1.3. The Committee contends that, by unilaterally choosing not to pursue the Habeas Petition, Attorney Einhorn "in essence [decided] to terminate his representation in a case that he was appointed by the Court to pursue", without protecting his client's interests. See Presentment at 12.

Attorney Einhorn failed to communicate to the court or to his client his decision to terminate representation on the Habeas Petition. He did not pursue the Habeas Petition, which he was appointed to handle. As he acknowledged in his letter to the court, had Attorney Einhorn informed the court of his plan, the court could have appointed alternative counsel or permitted Mr. Lacks to proceed pro se. See Einhorn Letter at 1. Furthermore, while Attorney Einhorn made periodic telephone calls and visits to Mr. Lacks from 2007 forward, he did nothing in those thirteen years to seek a commutation or otherwise mitigate Mr. Lacks' sentence. Intermittent phone calls and visits do not excuse his failure to represent Mr. Lacks in his Habeas Petition or to properly withdraw from representing Mr. Lacks.

15

From the outset of his professional relationship with Mr. Lacks in 2005, Attorney Einhorn never made clear the scope of his representation.  Instead, he misled Mr. Lacks to believe an advocate was pursuing his Habeas Petition while, in reality, Mr. Einhorn was willfully allowing the case to terminate.  Rule 1.16 is meant to "mitigate the consequences to the client" of an attorney's withdrawal, but Attorney Einhorn effectively unilaterally ended his representation of Mr. Lacks as to his habeas matter, leaving Mr. Lacks to the ultimate consequence: dismissal of his Habeas Petition.  See Commentary, Conn. R. Prof. Conduct 1.16.  For the foregoing reasons, the court finds that Attorney Einhorn knowingly violated Rule 1.16.

B.   What Discipline Is Warranted

Having established that Attorney Einhorn violated Rules 1.3 (diligence), 1.4 (communication), and 1.16 (terminating representation), the court must determine what form of discipline is warranted.  The Grievance Committee has recommended that Einhorn receive a public censure.  See Presentment at 13-14 (Doc. No. 21).  Attorney Einhorn argues that private censure is sufficient.  See Feb. 17, 2022 Oral Argument.

"Attorney disciplinary proceedings are intended to protect the public and the administration of justice from attorneys who fail to satisfy their professional obligations to clients, the public, and the legal system."  In re Hochbaum, 649 F. App'x 80, 84 (2d Cir. 2016).  To these ends, the Local Rules of Civil Procedure for the District of Connecticut authorize sanctions including "private or public censure."  See D.Conn. L.R. 83.2(c)(2).  The American Bar Association ("ABA") has established Model Standards to guide courts in determining which sanctions should issue.  See ABA Model Standards for Imposing Lawyer Sanctions, § 9.0 et seq.  The court has found these Standards helpful in reaching its decision.

16

The Second Circuit has held that "disciplinary dispositions should be public unless the misconduct was minor or there are significant mitigating circumstances" given "the public's strong interest in disciplinary proceedings." In re Hochbaum, 649 F. App'x at 84.  Under the ABA Standards, courts consider aggravating and mitigating factors listed in sections 9.2 and 9.3, id. at §§ 9.2 and 9.3, applying a presumption in favor of public sanctions.  Id. at § 1.2 ("lawyer discipline should be public, and disposition of lawyer discipline should be public in cases of . . . reprimand" except in cases of "minor misconduct, when there is little or no injury to a client, the public, the legal system or the profession . . . .").

With respect to Einhorn's misconduct, the balance of aggravating and mitigating factors does not in any way overcome this presumption in favor of public discipline.  Indeed, the factors weigh in favor of public censure.  Several aggravating factors exist.  First, Attorney Einhorn has been subjected to prior discipline by the Second Circuit for his failure to meet multiple filing deadlines leading to the dismissal of four criminal appeals.[14]  See ABA Model Standards at § 9.22(a); see also In re Einhorn, 428 F. App'x 26, 26 (2d Cir. 2011).  Second, Attorney Einhorn has substantial experience in the practice of law, ABA Model Standards at § 9.22(i), having practiced since 1997.  See Response to Order to Show Cause at 6-7.  Lastly, until a post-argument letter to the court, Attorney Einhorn did not acknowledge the wrongful nature of his conduct and contended that he was "strategizing" on behalf of his client before ultimately admitting that he should have, at the very least, informed the court and his client of his plan not to

---

[14] All four appeals were later reinstated.

17

file a memorandum or amended petition on behalf of Mr. Lacks.  ABA Model Standards at § 9.22(g); Einhorn Letter at 1.

There are some mitigating circumstances, including Attorney Einhorn's cooperative attitude toward the proceedings and his ultimate partial admission that his actions (or his inactions) were flawed.  ABA Model Standards at § 9.32(e).  Further, insofar as his lack of diligence was harmful to the court, his offenses are remote in time, as they occurred over a decade ago.  Id. at § 9.32(m).  However, his failure to communicate the disposition of the matter with his client is far more recent, as it began in 2007 but extended into 2020.  Id. at § 9.32(m).  Weighing the aggravating against the mitigating factors, the evidence clearly weighs in favor of public discipline.

Nor was Einhorn's misconduct so "minor" as to exempt him from public discipline. See In re Hochbaum, 649 F. App'x at 84; ABA Model Standards at § 1.2.  Such cases involve "little or no injury to a client, the public, the legal system, or the profession" as well as "little likelihood of repetition by the lawyer."  ABA Model Standards at § 1.2.  Here, Einhorn's willing lack of diligence in intentionally failing to meet Judge Kravitz's deadlines or file a memorandum in response to an express Order and warning from the court is harmful to the legal system.  "Persistent failure to comply with scheduling orders, or to properly withdraw . . . shows a disregard for [Attorney Einhorn's] responsibilities to the Court." In re Payne, 707 F.3d 195 at 217 (2d Cir. 2013) (citing Bennett v. Mukasey, 525 F.3d 222, 225 (2d Cir. 2008)).  Further, Attorney Einhorn's actions occurred both before and after Einhorn incurred a sanction from the Second Circuit, see In re Einhorn, 428 F. App'x at 26, so the court finds a likelihood of repetition that further warrants public discipline.

The harms to the legal system pale in comparison to the injury Mr. Lacks has suffered. While Attorney Einhorn contends that the Habeas Petition was unlikely to succeed and thus, that Mr. Lacks was not injured by Attorney Einhorn's actions, it is presumptuous of Attorney Einhorn to so assert. The court need not and will not analyze a case within a case to determine whether Mr. Lacks' habeas claims had merit. As the Second Circuit has held in a similar disciplinary matter, although "it is not possible to say how the Court would have acted had the claims been presented", Einhorn's "conduct deprived his client[ ] of the opportunity to have [his] claims heard, which thus prejudiced [him]." In re Payne, 707 F.3d at 217. Attorney Einhorn's failure to file an amended petition or memorandum, withdraw, or inform his client of the decision deprived Mr. Lacks of the chance to have his day in court.

Given that aggravating factors far outweigh any mitigating factors, as well as the seriousness of Einhorn's violation, along with the presumption in favor of public discipline, the court concludes that public censure is the proper sanction for Attorney Einhorn. The court notes that the Model Standards recommend public reprimand "[f]or violations involving a failure to act with reasonable diligence in representing a client" in cases "when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client." ABA Model Standards at § 4.42. The Model Standards recommend the harsher penalty of suspension for knowing violations. While the court might very well have concluded—based on Attorney Einhorn's defense—that the violations found in the proceedings were intentional and warranted suspension, it decides, based on the entirety of the record before it, to accept the Grievance Committee's recommendation of a public reprimand.

## IV.     CONCLUSION

For the foregoing reasons, Attorney Jonathan Einhorn is publicly censured.

**SO ORDERED.**

Dated at New Haven, Connecticut this 20th day of May 2022.

/s/
_____
Janet C. Hall
United States District Judge